**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Catherine KEARNS, Defendant–Appellant.**

No. 94–10373.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1995.

Decided Aug. 4, 1995.

Rhonda L. Repp, Prescott, AZ, for defendant-appellant.

Matthew F. Heffron, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: HALL, WIGGINS, and LEAVY, Circuit Judges.

WIGGINS, Circuit Judge:

## OVERVIEW

Catherine Kearns ("Kearns") was convicted of conspiring to distribute marijuana, in violation of 21 U.S.C. §§ 841 and 846, and of possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The district court sentenced Kearns to a 33–month prison term and a 60–month term of supervised release on each count, to run concurrently. As to count I, the court also imposed a $35,000 fine. The government's related civil forfeiture complaint against four properties owned by Kearns had been dismissed prior to trial. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm in part and reverse in part.

## FACTS

While defendant-appellant Catherine Kearns' husband, Jim Kearns ("Jim Kearns"), was incarcerated in a federal prison in Arizona, he approached another inmate, Sergio Teran, regarding a drug transaction. According to Teran's testimony, Jim Kearns stated that he and a partner were interested in buying large amounts of marijuana for distribution in Boston. Jim Kearns asked if Teran could supply the marijuana. He told Teran that he had been involved in drug trafficking before his incarceration, and that, through his wife, he invested his money in houses and properties.

Teran's wife, Rosemary Teran, had previously agreed to provide information to the Glendale Police Department ("GPD") to assist them in drug investigations. She and her husband Sergio agreed to act as informants regarding the Kearnses' drug operation. The Terans testified that they met several times at the prison with Jim and Catherine Kearns and Catherine's son, Ron Lynch. At those meetings, the parties made arrangements for the marijuana sales. During one of those meetings, Jim Kearns identified another prison visitor as Hobart Willis, the "financier" of the operation. Rosemary Teran testified that she also spoke several times with Catherine Kearns outside the prison regarding drug purchases.

During their prison meetings, the Kearnses, Lynch, and the Terans agreed that the first marijuana purchase would be for 100 pounds and would be conducted by Lynch. On September 6, 1990, Lynch met GPD Officer Pino, who posed as Sergio Teran's cousin, in a Mega Foods store parking lot. Pino and Lynch examined the marijuana in Pino's car and the money Lynch had brought, and then Lynch was arrested.

Catherine and Jim Kearns and Lynch were indicted for conspiracy to distribute over 220 pounds of marijuana (count I), and possession with intent to distribute approximately 50 pounds of marijuana (count II). Lynch pled guilty before trial. Catherine

and Jim Kearns were tried separately, and Jim Kearns was convicted.

Before Catherine Kearns' trial had begun, the government filed a civil forfeiture complaint against four properties owned by Kearns. After the criminal trial had begun, Kearns filed a claim to the properties and an answer to the civil forfeiture complaint.

Kearns' trial on the criminal charges began on March 18, 1992, but the district court dismissed the indictment on the last day of trial. After the dismissal, the government and Kearns entered into a compromise settlement agreement to resolve the civil forfeiture proceeding. Pursuant to the agreement, the government's complaint was dismissed with prejudice, all properties were returned to Kearns, the rental income ($1,035) collected from one of the properties was applied to the U.S. Marshal's costs for maintaining the property, and Kearns agreed to a hold harmless agreement regarding the government's seizure and retention of the properties.

Following the government's appeal in the criminal case, this court ordered reinstatement of the indictment. *United States v. Kearns*, 5 F.3d 1251 (1993). Kearns was convicted on both counts in April 1994, and she was sentenced in June 1994. She timely appeals her conviction and sentence.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE ON COUNT II

The evidence is sufficient to support Kearns' conviction for possession with intent to distribute marijuana if, reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Lennick*, 18 F.3d 814, 818 (9th Cir.),

*cert. denied,* —— U.S. ——, 115 S.Ct. 162, 130 L.Ed.2d 100 (1994).

Kearns never had actual possession of the 50 pounds of marijuana that are the subject of count II. We may nevertheless affirm her conviction on count II if her coconspirator, Ron Lynch,[1] had possession of the marijuana, thereby rendering Kearns in constructive possession. The question, therefore, is whether the evidence was sufficient to support a finding that Lynch possessed the marijuana.[2] We conclude that it was not.

The Terans testified that after meeting several times in prison with Jim and Catherine Kearns and Ron Lynch, they decided that Lynch would make the first purchase of marijuana from Sergio Teran's "brother" (who was actually Detective Hawkins). Hawkins arranged for Lynch to meet with Teran's "cousin" (actually undercover officer Jose Pino), who was to deliver the drugs. Lynch and Pino met on September 6, 1990 in the parking lot of a Mega Foods store to conduct a 50–pound transaction. Lynch and Pino opened the trunk of Pino's car to inspect the 50–pound bag of marijuana. Lynch opened the bag, put his hands into it, took out a small amount, and smelled it. Pino closed the trunk, leaving the marijuana in his car. Lynch and Pino then went to Lynch's car and Lynch opened the trunk to show Pino envelopes containing the purchase money. Pino inspected the money, and then signalled surveilling officers to arrest Lynch.

The foregoing events do not involve many of the typical indicia of possession present in other cases. For example, the marijuana remained in Pino's car, there was no showing that Lynch obtained control over Pino's car (*e.g.,* by possessing a key to it), and Lynch was arrested before the transaction actually took place. *See O'Connor,* 737 F.2d at 818 (sufficient evidence of constructive possession existed where defendants controlled the tests

---

1. Kearns concedes that the evidence, viewed in the light most favorable to the government, supports a finding that Lynch and Kearns were coconspirators.

2. Kearns asserts that Lynch's lack of possession is established by the GPD officers' testimony that

they never intended to allow Lynch to possess the marijuana. The officers' intentions are not dispositive, however. *See United States v. O'Connor,* 737 F.2d 814, 819 & n. 3 (9th Cir.1984), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985).

performed on the drugs and then "supervised the secreting of the cocaine in their vehicle"); cf. United States v. Medrano, 5 F.3d 1214, 1217–18 (9th Cir.1993) (insufficient evidence of constructive possession where there was no evidence that undercover officers, who had placed ephedrine in the trunk of the defendant's car pursuant to the defendant's instructions, had returned the car keys to the defendant). The strongest evidence that Lynch acquired "possession" of the drugs is the fact that he briefly touched and smelled the marijuana in Pino's trunk.

Prior Ninth Circuit cases that have upheld convictions for possession where a defendant had sampled the drugs involved other evidence of possession as well. In United States v. Baron, for example, the evidence indicated not only that the defendant had handled and sampled the drugs, but also that the defendant had dumped the drugs and even cleaned out the container when she realized that she was under surveillance. 860 F.2d 911, 919 (9th Cir.1988), cert. denied, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989). Similarly, in O'Connor, two defendants controlled the tests that were performed over a two-hour period on each of 31 bags of cocaine, and two other defendants actually performed the tests and handled the cocaine extensively. 737 F.2d at 818. After sampling the cocaine, the defendants took the additional step of secreting it in their vehicle. Id.

We hold that Lynch's brief sampling of the marijuana, in the absence of other steps taken to give him physical custody of or dominion and control over the drugs, is not sufficient to constitute "possession." Because Lynch did not possess the marijuana, Kearns did not either. Accordingly, we reverse Kearns' conviction on count II due to insufficient evidence.

## II. ALLEGED TRIAL ERRORS

### A. Admission of a Coconspirator Statement

■ Over Kearns' objection, the district court admitted a statement in which Jim Kearns allegedly told government informant Sergio Teran that Catherine Kearns was involved in the drug operation. At trial, Teran testified as follows:

Q: [by the prosecutor] As [Jim Kearns] was first approaching you, did he tell you anything about his wealth and where his wealth came from?

A: Well, he said that when he was out on the street, he was a wealthy man, had money, that he was dealing pretty heavy.

Q: Dealing in what?

A: Drugs.

Q: Did he tell you where he invested his money in the Phoenix area?

A: He had cars, boat, houses, properties.

Q: When you say houses and properties, did he tell you how he went about investing his money in houses and properties? Who helped him?

A: I remember he told me his wife, through his wife.

Q: Through his wife, he was able to invest in these properties?

A: Yes, sir.

We hold that the district court did not abuse its discretion by admitting this hearsay statement under Fed.R.Evid. 801(d)(2)(E). See United States v. Peralta, 941 F.2d 1003, 1006 (9th Cir.1991) (admission of Rule 801(d)(2)(E) evidence is reviewed for abuse of discretion), cert. denied, 503 U.S. 940, 112 S.Ct. 1484, 117 L.Ed.2d 626 (1992). Under Rule 802(d)(2)(E), the statement is admissible if it was made by a coconspirator of the defendant during the course and in furtherance of the conspiracy. We find no clear error in the district court's underlying factual determinations that Kearns was connected to an existing conspiracy, and that the statement was made during the course of, and in furtherance of, the conspiracy. See id. (factual findings are reviewed for clear error).[3]

---

3. As an initial matter, we reject Kearns' contention that the district court did not make sufficient factual findings. To the contrary, the record adequately indicates that the court found all the necessary predicates to admissibility. See United States v. Tamez, 941 F.2d 770, 775 (9th Cir. 1991).

### 1. Connection to an Existing Conspiracy

Kearns does not dispute that a conspiracy to possess marijuana with intent to distribute it existed. We conclude that the government presented sufficient evidence for the trial court to determine, by a preponderance of the evidence, that Kearns was connected to the conspiracy. *See Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). Rosemary Teran testified that Kearns was heavily involved in the discussions to arrange drug purchases. Rosemary and Sergio Teran both testified to Kearns' active participation in the actual drug transactions. Officer Pino testified that Lynch told him that "the old lady" was supposed to have the drug money, and the jury could infer that "the old lady" meant Lynch's mother, Kearns.

### 2. In Furtherance of the Conspiracy

"[T]o be 'in furtherance' the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy. Statements made to induce enlistment or further participation in the group's activities are considered to be 'in furtherance' of the conspiracy." *United States v. Yarbrough,* 852 F.2d 1522, 1535 (9th Cir.) (citations omitted), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988).

Jim Kearns' statement to Teran was made in an attempt to have Teran supply marijuana to Jim Kearns and his partner. The district court concluded that the statement furthered Jim Kearns' attempt to enlist Teran (and thereby furthered the conspiracy) by "speaking with respect to the economic foundation for [the Kearnses'] ability to buy marijuana and to traffic in it." This finding is not clearly erroneous.

### 3. During the Course of the Conspiracy

Finally, to be admissible under Rule 801(d)(2)(E), there must be " '[s]ufficient evidence ... to support an inference that the statement[ ] [was] made ... while the conspiracy was in existence.' " *United States v. Layton,* 720 F.2d 548, 555 (9th Cir.1983) (quoting *United States v. Fielding,* 645 F.2d 719, 726 (9th Cir.1981)), *cert. denied,* 465 U.S.

1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). The district court did not clearly err by finding that the statement was made while the conspiracy was in existence.

Statements made by Jim Kearns around the time of the challenged statement clearly suggest that an agreement to distribute marijuana existed before Jim Kearns approached Teran. Other evidence supports this inference as well. Sergio Teran testified that Jim Kearns identified Willis as Kearns' "partner from Boston" who was looking for a new source of marijuana because his "connection couldn't find any"; and Rosemary Teran testified that Catherine Kearns explained that she had $50,000 available for the drug purchase but she had sent it back to Boston because the money was "just sitting there being wasted and they wanted to put [the money] to work." The real property deeds, discussed below, also provide some indication of a prior relationship between the Kearnses and Hobart Willis, the alleged "partner" and financier of the drug operation. The jury could infer from the foregoing evidence that the Kearnses' partnership and Boston-based operation existed prior to the time that Jim Kearns approached Sergio Teran.

### B. Admission of Real Property Deeds

■ Over Kearns' objection, the district court admitted several deeds that related to three pieces of real property. The deeds showed the transfer of each property between various conspirators (*i.e.,* Catherine Kearns, Jim Kearns, and Ron Lynch). The court only admitted deeds to properties that were also transferred among Hobart or Margaret Willis. The parties stipulated that Teran had identified Hobart Willis as the individual Jim Kearns introduced as the operation's "financier."

■ Kearns contends that the deeds are evidence of "other crimes" that are subject to Fed.R.Evid. 404(b). The district court's decision to admit the deeds into evidence is reviewed for an abuse of discretion. *See United States v. Santa–Cruz,* 48 F.3d 1118, 1119 n. 1 (9th Cir.1995) (Rules 404(b) and 403); *United States v. Rubio–Topete,* 999 F.2d 1334, 1338 (9th Cir.1993) (relevancy).

Whether the deeds constitute "other crimes" evidence is a question of law reviewed *de novo*. *United States v. Warren*, 25 F.3d 890, 895 (9th Cir.1994).

We reject Kearns' contention. The deeds do not constitute "other acts" evidence because they do not show "wrongs or acts showing character.... Even if the [deeds] somehow showed bad acts, they were not offered to 'prove the character of a person in order to show action in conformity therewith.'" *See United States v. Sanchez–Robles*, 927 F.2d 1070, 1078 (9th Cir.1991) (quoting Fed.R.Evid. 404(b)).

Here, as in *Sanchez–Robles*, the evidence is not within the scope of Rule 404(b). Instead, the deeds are "'relevant ... to rebut [the defendant's] defense.'" 927 F.2d at 1078 (quoting *United States v. Gering*, 716 F.2d 615, 621 (9th Cir.1983)). The deeds were relevant to show Kearns' previous and extensive involvement with the other conspirators and to rebut her defense that she was not an active participant in the activities of Jim and Ron to distribute marijuana. Accordingly, we hold that the district court did not abuse its discretion by admitting the deeds.

### C. Expert Testimony Regarding Drug Trafficking

Over Kearns' objection, DEA Agent Al Reilly testified as an expert that:

1. "User" amounts of marijuana would not exceed five pounds in a year;
2. Drug traffickers attempt to "put someone between them[selves] and the [drug] buyer, for fear that the buyer may be the police";
3. Informants are critical to investigation of drug crimes, because they allow law enforcement personnel to "find out what's happening inside" and they are necessary to "introduce an undercover agent";
4. Drug traffickers try to "visit the source of the drugs and make sure they are not the police"; and
5. Drug transactions usually involve cash because cash leaves no "tracks, no records."

Kearns does not dispute that Reilly was qualified to testify as an expert. She argues, however, that his testimony is inadmissible under Fed.R.Evid. 702 because it related to matters within jurors' common knowledge, and therefore was not necessary to assist the trier of fact. She also claims that Reilly's testimony amounted to improper vouching for a government witness and informant, Rosemary Teran. We reject both arguments.

Reilly's testimony regarding the "modus operandi" and characteristics of criminal activity is similar to expert testimony that this court has held admissible under Rule 702 in prior cases. *See, e.g., United States v. Alonso*, 48 F.3d 1536, 1540 (9th Cir.1995) (citing cases). The district court was well within its discretion to conclude that Reilly's testimony would "assist the trier of fact," as required by Rule 702.

Reilly's testimony also did not amount to "vouching" for Rosemary Teran. Reilly merely noted the importance of informants to drug investigations generally. He made no specific mention of Teran, or of her role, usefulness, or credibility as an informant. In fact, he stated on cross-examination that he was not involved in this case at all. Reilly did not "plac[e] the prestige of the government behind" the testimony of Rosemary Teran. *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.1993).

### III. DOUBLE JEOPARDY CLAIM

Kearns now argues that her criminal trial, following dismissal of the government's related civil forfeiture proceedings, violated her protection against double jeopardy. She accordingly seeks reversal of her criminal conviction. It is unclear whether we can review Kearns' double jeopardy claim for plain error. *See United States v. Lorenzo*, 995 F.2d 1448, 1457–58 (9th Cir.) (noting that some cases treat a double jeopardy claim that is not raised in district court as waived, while other cases allow plain error review), *cert. denied*, —— U.S. ——, 114 S.Ct. 225, 126 L.Ed.2d 180 (1993). We need not decide whether plain error analysis applies, howev-

er, because, even assuming that it does,[4] we reject Kearns' double jeopardy claim.

The timing of the criminal and civil proceedings in this case eliminates the double jeopardy problem alleged by Kearns. Jeopardy attaches in a criminal trial when the jury is empaneled and sworn. *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2160–61, 57 L.Ed.2d 24 (1978). In this case, the jury was sworn on March 18, 1992.[5] Although this court has not determined exactly when jeopardy attaches in a civil forfeiture proceeding, we have stated that it attaches no earlier than the date on which the defendant filed an answer to the forfeiture complaint. *United States v. Barton,* 46 F.3d 51, 52 (9th Cir. 1995). The date on which Kearns filed her answer, and thus the earliest time at which jeopardy could have attached, was March 31, 1992. Because, in this case, "jeopardy attached first in the criminal proceeding, that proceeding did not violate the double jeopardy clause and [the defendant's] criminal conviction must stand." *See United States v. Faber,* 57 F.3d 873, 875 (9th Cir.1995).[6]

## IV. EIGHTH AMENDMENT CLAIM

■ Kearns argues that she suffered a forfeiture in the civil proceeding and that the forfeiture, in conjunction with her criminal fine, violates the Excessive Fines Clause. Because she did not raise this issue before the district court, we review the claim for plain error. *See United States v. Caperell,* 938 F.2d 975, 980 & n. 5 (9th Cir.1991) (legal issue not raised during sentencing hearing is reviewed for plain error).

The Excessive Fines Clause applies to civil *in rem* forfeitures under all three statutes invoked in the forfeiture complaint in this case (21 U.S.C. § 881(a)(6) and (a)(7), and 18 U.S.C. § 981(a)(1)(A)). *See Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488 (1993); *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210, 1219 (1994), *amended,* 56 F.3d 41 (9th Cir. 1995). Because the forfeiture complaint was dismissed pursuant to a voluntary agreement between the parties, whereby all the properties were returned to Kearns, no forfeiture was actually imposed. *See Black's Law Dictionary* 584–85 (5th ed. 1979) ("forfeiture" is defined, *inter alia,* as the "*[l]oss* of some right or property as a penalty for some illegal act") (emphasis added).

We reject Kearns' attempt to characterize as a "forfeiture" her subsequent loss of two of the properties in foreclosure sales. Kearns presented no evidence that her loss was caused by the government's seizure. Moreover, even if she had, that loss does not constitute a "forfeiture" or "punishment" that would trigger the protections of the Excessive Fines Clause. *See Austin,* —— U.S. at ——, 113 S.Ct. at 2805 ("The Excessive Fines Clause limits *the Government's power to extract payments,* whether in cash or in kind, 'as *punishment* for some offense.' ") (first emphasis added) (quoting *Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 265, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989)); *id.* at —— – ——, 113 S.Ct. at 2812–13 (Scalia, J., concurring in part and concurring in the judgment) ("the term 'fine' [as used in the Eighth Amendment] was 'understood to mean a *payment to a sovereign* as punishment for some offense' ") (emphasis added) (quoting *Browning–Ferris Indus.,* 492 U.S. at 265, 109 S.Ct. at 2915).

We conclude that Kearns' civil forfeiture proceeding did not result in any forfeiture. Accordingly, we hold that the Excessive Fines Clause was never implicated and that the district court did not plainly err by fail-

---

**4.** Under plain error analysis, Kearns must show "error that is 'obvious' or otherwise plainly affects the fairness or integrity of the judicial process." *Lorenzo,* 995 F.2d at 1458 n. 4.

**5.** The district court's dismissal of the indictment is not an event, such as an acquittal, that would terminate Kearns' initial jeopardy. *See Richardson v. United States,* 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984); *Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 308–09, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984).

Thus, the dismissal and Kearns' subsequent retrial do not change the fact that jeopardy in her criminal proceedings attached on March 18, 1992.

**6.** Because we reject Kearns' double jeopardy claim on this ground, we do not consider whether the civil forfeiture proceedings subjected Kearns either to multiple punishments or multiple proceedings for the same offense, in violation of the Double Jeopardy Clause.

ing to consider the alleged forfeiture in imposing Kearns' criminal sentence.

## CONCLUSION

For the foregoing reasons, we reverse Kearns' conviction on count II due to insufficient evidence. We reject Kearns' other points of error and affirm her conviction and sentence as to count I.

AFFIRMED IN PART AND REVERSED IN PART.